SAM BAILEN, APPELLANT, v. E. P. BADGER IMPORT COMPANY ET AL., APPELLEES.

FILED NOVEMBER 13, 1915. No. 18231.

1. **Appeal: MOTION FOR NEW TRIAL: SUFFICIENCY OF EVIDENCE.** This court will not, upon appeal, determine questions that were not fairly presented to the trial court. Ordinarily an assignment in the motion for new trial that "the judgment was erroneous because it was con-

trary to law" will not be considered sufficient to challenge the attention of the trial court to the question of the sufficiency of the evidence to support the judgment. But when there is no substantial conflict in the evidence, and the sole question is whether upon the conceded facts the law will support the judgment, so that the court must have considered the sufficiency of the evidence in passing upon the motion for new trial, this court upon appeal should also consider that question and determine the case accordingly.

2. **Fraudulent Conveyances: SALES IN BULK.** The bulk sales law (Rev. St. 1913, sec. 2651) does not prohibit the transfer of an entire stock of goods to a creditor in payment of a pre-existing debt, or to a trustee for the benefit of certain creditors, but, in order to be valid, such a sale or transfer must comply with the requirements of that law.

APPEAL from the district court for Holt county: R. R. DICKSON, JUDGE, *Affirmed.*

*W. K. Hodgkin, J. F. Power* and *Sears & Snyder,* for appellant.

*J. J. Harrington, contra.*

LETTON, J.

On July 9, 1912, Chambers & Company, who for some years prior thereto had been in the retail merchandise business at Atkinson, finding themselves unable to meet their liabilities, executed and delivered to their principal creditor, C. Shenkberg Company, a corporation of Sioux City, Iowa, an instrument reciting that they "hereby sell, grant, convey and assign" unto the second party their stock of merchandise, consisting of dry goods, groceries, boots and shoes, etc.; also the furniture and fixtures used in connection with the stock. The instrument also transferred and assigned to the second party all their book accounts, bills receivable, and evidences of indebtedness. They constituted the second party their "agent, trustee, and attorney in fact, and in their place and stead, to take over, manage, run, and to continue said business, or to sell at public or private sale" all or part of the stock, fixtures and personal property conveyed. It was provided that, if the second party deem it advisable, they may keep up the stock by the purchase of new goods. The instru-

ment recites that suits at law are pending to recover debts for goods, and that it is deemed best, for the purpose of keeping the assets together, "to place the business in such shape that all creditors of the same class will receive the same treatment with reference to the payment of their debt." It was further agreed that the second party, after disposing of the property, should pay all the expenses of carrying out the trust, including a charge for his services and for the services of his attorney, pay for new goods purchased, pay all taxes, rents and clerk hire now due, pay and discharge in full, if the residue of the funds is sufficient, all the debts, liabilities due and owing "to wholesalers, or other unsecured creditors of the same class, or such creditors as shall become parties hereto and file their claims or demands with the party of the second part." It is further recited that one of the considerations for the execution of this instrument is that the party of the first part shall be released and absolved from liability on any unpaid portion of the claims against them as to claims of creditors who accept this trust deed and indicate their acceptance thereof in the manner provided for, and that creditors who file their claims "shall execute an instrument in writing agreeing that the first party and the individual members of the firm shall be and stand released on any unpaid portion of the claims filed with the second party." The second party took possession of the stock and sent letters to the creditors inclosing a copy of the instrument and a blank form of acceptance and release. The defendant, the E. P. Badger Import Company, one of the creditors, paid no attention to this communication, but proceeded with an action which it had already begun and obtained judgment against Chambers & Company for the amount of its claim. The assignee concluded it would be advisable to sell the property at public sale, and this was done on August 8, 1912. On the next day the defendant obtained judgment for the sum of $399.10 and costs. Execution was issued three days later and placed in the hands of defendant Grady, as sheriff of Holt county, who on the same

day levied the execution upon the goods as the property of Chambers & Company and took possession of the same. On August 15 plaintiff commenced the present action and retook the merchandise under a writ of replevin. The case was tried without the intervention of a jury, and from the findings and judgment in favor of defendant, plaintiff appeals.

Defendant insists that plaintiff is not in a position to question the judgment on appeal, for the reason that in his motion for a new trial his only assignment was that the judgment "was erroneous because it was contrary to law." The office of a motion for new trial is to give the trial court an opportunity to correct errors. When the record is complicated and many questions are presented and decided upon the trial, an assignment in the motion for new trial that the judgment is contrary to law may not challenge the attention of the court to the errors relied upon and give opportunity to correct them. It is generally held that such assignment is not sufficient to call attention to the sufficiency of the evidence to support the judgment. When, however, the record shows that there is no substantial conflict in the evidence, and that the sole question is whether upon the conceded facts the law will support the judgment, and that the court must have considered the sufficiency of the evidence in passing upon the motion for new trial, this court upon appeal should also consider that question and determine the case accordingly. Technical rules intended to secure the substantial rights of the parties are not to be strictly enforced when it is manifest that their application would defeat, rather than promote, justice. This matter is more fully discussed in the opinion in *Waxham v. Fink,* 86 Neb. 180.

Defendant also contends the assignment constitutes a sale in bulk and is void as to creditors, for the reason that it was made without compliance with the provisions of section 2651, Rev. St. 1913. This section provides: "The sale, trade or other disposition in bulk of any part or the whole of a stock of merchandise, otherwise than in the

ordinary course of trade and in the regular and usual prosecution of the seller's business, shall be void as against the creditors of the seller," unless certain provisions with respect to the making of an inventory of the goods and a list of the creditors and the giving of notice to such creditors be complied with. It is conceded that the requirements of this statute were not followed, and it is contended by the appellant that such a transfer for the benefit of creditors who release their claims is not embraced within the prohibition of the statute. It will be noticed that the statute specifically prohibits a disposition in bulk "otherwise than in the ordinary course of trade and in the regular and usual prosecution of the seller's business." The appellant contends that in this state it is lawful for a debtor to prefer any one or more of his creditors, that the assignment was made in good faith, with no intention of evading the provisions of the law, and was not in violation of its spirit or intent. By the terms of the assignment no creditor was entitled to share in the proceeds unless he accepted, or agreed to accept, a possible *pro rata* payment in full of his demand, and released the individual members of the partnership from liability for any balance that might exist. A creditor who refused these terms could receive nothing, and thus would be prevented from receiving the benefits the legislature intended by the passage of the bulk sales law. The debtor sought to compel each creditor to accept a share of the proceeds of the firm assets, and to release a valid claim against the individual members of the partnership.

A similar question was considered by the supreme court of Massachusetts (in which state, as in this, debtors may lawfully prefer creditors) in a case where an insolvent debtor in that state transferred his stock in bulk to a *bona fide* creditor without compliance with the bulk sales law of that state, which is substantially the same as that of this. After holding that the transfer might be valid by way of accord and satisfaction as between the debtor and creditor themselves, the court say:

"But the transaction had another phase, so far at least as respected Kopec's other creditors. There was a change in the ownership of the property, which, if valid as against them, freed from liability property which theretofore could have been attached by them; and thus their security was impaired. While it is true that in its strictest sense a sale is a transfer of personal property in consideration of money paid or to be paid, still in the interpretation of statutes it is often held to include barter and any transfer of personal property for a valuable consideration. * * * We are of the opinion that the statute in question was intended to prevent a trader from disposing of his stock of merchandise in a manner outside his usual course of business, so that the same should be taken away from his creditors in general, and that the transfer under the circumstances disclosed in this case was a sale, although made to a creditor." *Gallus v. Elmer*, 193 Mass. 106.

Construing a similar statute, the supreme court of Georgia, in *Sampson v. Brandon Grocery Co.*, 127 Ga. 454, said: "Construing the act of 1903 and section 2697 together, we may easily reach the conclusion that sales of stock in bulk by a debtor to a creditor, in extinguishment of his debt, in whole or in part, are still permissable, but that such sales are null and void unless there be compliance with the terms of the act of 1903." (Bulk sales law.) In discussing the matter the court suggested that, if the value of the goods exceeded the amount of the debt and the excess was paid in cash or by the giving of a promissory note, could it be said that such a transaction would not be within the statute? And that, if such a sale for acquittance of the debt and an additional consideration comes within the act, why should a sale in extinguishment of the debt be excluded?

To the same effect are the cases of *Humphrey v. Coquillard Wagon Works*, 37 Okla. 714, and *Youghiogheny & Ohio Coal Co. v. Anderson*, 152 N. W. (Mich.) 1025. The object of the statute is pointed out in the cases followed,

which is the protection and benefit of all creditors. The legislature was of the opinion that a disposition of a stock of goods otherwise than in the usual course of business interferes with the just rights of creditors. If the provisions of the law are followed, the end attained will be to put creditors more nearly upon an equality than before with respect to the collection of claims, in cases of a disposition of a whole stock. The supreme court of Washington seem to take a contrary view, but we believe the rule adopted by other courts is more in accordance with the purpose and intention of the legislature.

It has been suggested that by remaining silent and making no objections to the assignment and sale the defendant was estopped to proceed against the goods. But there could be no estoppel, because by the very terms of the assignment no creditor could be bound by it unless he filed a claim with the trustee, and, in addition, filed a release of the debtor for all liability for his debt in excess of any dividend received. Under such a provision notice by a creditor that he did not or would not agree to the assignment was unnecessary. His silence could not give consent. On the contrary, it clearly indicated his nonassent and his purpose to rely on the legal proceedings he had instituted. The purchaser at the trustees sale was bound to take notice of the title he was buying and of the limitations of the instrument. He could not be an innocent purchaser under the circumstances.

The judgment of the district court is

AFFIRMED.

HAMER, J., concurring.

The dissent of Judges Fawcett and Sedgwick might be supported without doing any great violence to the principles of law applicable to the facts. The justice of the plaintiff's claim has much to commend it. This is one of those cases where arguments may be found on either side. When Chambers & Company found themselves unable to meet their liabilities, they executed and delivered to one of

their creditors, a corporation, C. Shenkberg Company, an instrument reciting the sale and conveyance of their stock of merchandise, and also their furniture and fixtures and all book accounts and bills receivable, together with other evidences of indebtedness. They undertook to create the corporation mentioned their agent, trustee, and attorney in fact to manage and continue the said business or to sell all the property conveyed. The purpose appears to have been that all creditors of the same class might receive the same treatment with reference to the payment of their debts. It was one of the considerations for the execution of the instrument made that said Chambers & Company be released from liability on any unpaid portion of the claims against them as to the claims of such creditors as accepted the trust deed and indicated acceptance thereof. Such of the creditors as accepted the trust deed were by the terms of the said instrument to execute a release on any unpaid portion of the claims filed with the trustee. The corporation to which transfer was made took possession of the stock, sent letters to the creditors notifying them of the transfer, and including a blank form of acceptance and release. The E. P. Badger Import Company, one of the creditors, disregarded the communication and prosecuted an action, which it had already commenced, and obtained a judgment against Chambers & Company for the amount of its claim. The assignee sold the property at public sale August 8, 1912. The defendant, the E. P. Badger Import Company obtained its judgment for $399.10 and costs, and then issued an execution and placed it in the hands of the sheriff of Holt county. He levied the execution upon the goods sold as the property of Chambers & Company and took possession of the same, and then the plaintiff commenced this action and retook the merchandise under a writ of replevin. The court made findings and rendered a judgment in favor of the defendant, the E. P. Badger Import Company. The plaintiff appeals from this judgment.

It is claimed by the defendant that the plaintiff is not in position to question the judgment on appeal, for that in his motion for a new trial his only assignment was that the judgment was erroneous because it was contrary to law. The dissenting opinions contend that the office of a motion for a new trial is to give the trial court an opportunity to correct errors; that an assignment in the motion for a new trial alleging that the judgment is contrary to law may not challenge the attention of the court to the error relied upon, and so may give no opportunity to correct them; that such an assignment would not be sufficient to call the attention of the court to the sufficiency of the evidence to support the judgment. It is said in the majority opinion: "When, however, the record shows that there is no substantial conflict in the evidence, and that the sole question is whether upon the conceded facts the law will support the judgment, and that the court must have considered the sufficiency of the evidence in passing upon the motion for new trial, this court upon appeal should also consider that question and determine the case accordingly." It is also said in the majority opinion that technical rules are not to be strictly enforced when it is manifest that their application would defeat justice rather than promote it. An authority is cited, and this view would seem to be correct.

It is further said in the majority opinion that the assignment constitutes a sale in bulk, and is void as to creditors, for the reason that it was made without compliance with the provisions of section 2651, Rev. St. 1913. The act in question provides for an inventory of the goods and a list of the creditors and the giving of notice to such creditors. The statute prohibits a disposition in bulk "otherwise than in the ordinary course of trade." The appellant claims that in this state it is lawful for a debtor to prefer any one or more of his creditors; that in this case the assignment was made in good faith, with no intention of evading the provisions of the law; and that it is not in violation of the spirit of the law. It will be noticed that

no creditor was entitled by the terms of the assignment to share in the proceeds of the the sale unless he accepted, or agreed to accept, a *pro rata* share in full of his demand. He was also required to release the individual members of the partnership from any liability for any balance.

It is said in the majority opinion that the statute in question was intended to prevent a trader from disposing of his stock of merchandise in a manner outside of his usual course of business. I do not think the bulk sales law is in any way applicable to this case. I do not think it is required that it should be considered. If the property was sold and the defendant stood by while the trustee sold it and made no objection, it is in no condition to levy on the stock of goods for the satisfaction of his judgment, unless it in some way indicated that the arrangement made was not acceptable to it. If it did that, and executed no release, and did not indicate in any other way that it accepted the manner of settlement proposed, then it was at liberty to take its judgment and cause a levy to be made upon the property. It did that, and the property was taken away from the sheriff by a writ of replevin and by one who was a party to the execution of the transfer. As the defendant did not acquiesce in the arrangement made and did not release the debtors or agree to release them, it is not bound. The defendant could not be estopped, because it could not be bound unless it agreed to the contract made. When the defendant did nothing tending to show its consent to the agreement, it thereby indicated that it did not assent. Something affirmative was required of it before it could be bound.

The purchaser at the trustee's sale could only take such title as his grantor had to give him. In this case the grantor had no title because of the infirmity of the proceedings and the failure of all of the creditors to come into the arrangement and join in the contract. The purchaser therefore is without title. He cannot claim to be an innocent purchaser. He knew that there was a defect in the title.

He knew that he was only getting such title as the trustee had to convey to him. It is therefore proper to affirm the judgment of the district court.

SEDGWICK, J., dissenting.

A debtor cannot compel his creditors "to accept a share of the proceeds of the firm assets." The majority opinion ably and laboriously establishes that proposition. A debtor may induce his creditors to agree to a fair and equitable distribution of all the assets. If a creditor consents to a sale of all of the assets of his debtor at public auction, and a purchaser at such sale has reason to believe and does believe that the creditor has consented to the sale, and so pays full value for the assets, such creditor ought not afterwards to be allowed to assert any claim against the goods so purchased. There is apparently no controversy as to the facts in the case. The business of the debtor was in a very bad condition. There were about 40 creditors, one of whom had a claim more than the total value of the assets. Some of the creditors, including this defendant, had begun litigation on their claims. The debtor could take advantage of the bankruptcy law, and so compel all creditors to take a *pro rata* portion of the assets and cancel their claims. The expenses of such proceedings would exhaust substantially all of the assets and leave little or nothing for any creditor. It was thought that the creditors would, under the circumstances, agree to a more reasonable remedy; whether they had suits pending or had judgments or had taken no action on their claims could make no difference. Every other creditor was fully notified of every step in the proceedings. Other creditors who had suits pending also consented to the sale at auction by making no objection to the proceedings. When they learned of the transfer in trust for all creditors, they might at once have attached the goods, or if they remained silent with full notice of the contemplated sale, and so estopped themselves to claim the property itself, instead of the proceeds thereof, they might still have attached the proceeds in the

hands of the trustee.  Either of these courses would have raised the question of the application of the bulk sales law, and would have made its discussion necessary.  Not having taken either of these remedies, they could have presented their claims to the trustee in accordance with the arrangement.  It was clearly intended by all parties that the creditors would present their claims to the trustee for the *pro rata* share when the property was sold and the money in the hands of the trustee for distribution.  The assignment to the trustee for the benefit of the creditors is clear upon this point.  About 39 creditors took that course, and after this plaintiff had paid full value for the goods, and while the money was in the hands of the trustee, one undertook to take the goods from the purchaser at the sale.  But the majority opinion says: "There could be no estoppel because by the very terms of the assignment no creditor could be bound by it unless he filed a claim with the trustee, and, in addition, filed a release of the debtor for all liability for his debt in excess of any dividend received."  That is, a creditor could remain silent and make no objection to the sale, because he did not file his claim with the trustee before there were any funds in his hands to distribute.  When should he "release the debtor for all liability?"  When the goods were turned over to the trustee to be sold for all the creditors, it devolved upon the creditors to consent or object to the proposed sale and distribution.  If they consented, there was nothing for them to do until the proceeds of the sale were in the hands of their trustee, when they could present their claim and release.

In Nebraska a man can assign his property for his creditors without complying with the assignment act.  If he does, it will be valid, unless it is fraudulent.  That is, unless he attempts directly or indirectly to keep some of the property for himself.  If he does that it is fraudulent and void.  If it is all to go to his creditors, it makes no difference whether he treats them all alike or not, since he has the right to prefer creditors.  If he assigns to one creditor

more than enough to pay his claim, and expects to get some advantage to himself by so doing, such assignment would be void. All of the above propositions are decided in *Meyer v. Union Bag & Paper Co.,* 41 Neb. 67, and the many cases there cited.

The questions in our case are: (1) Can the creditors and the debtor agree to sell the debtor's property and divide the proceeds prorated among the creditors? (2) If the debtor proposes to do so, and asks the creditors to agree that he may, and 39 out of 40 creditors agree to it, do the common rules of estoppel apply to the fortieth creditor who allows the others to suppose that he consents also? (3) Will a purchaser at the sale who pays full value for the property, supposing that the creditors are selling it, be protected in his title, as against a creditor who purposely allows the purchaser to suppose that as one of the creditors he is making such sale?

FAWCETT, J., dissenting.

In addition to what is said by Judge Sedgwick in his dissenting opinion, I desire to suggest the following: The bulk sales law was designed to prevent the fraudulent secret selling of a stock of merchandise by a failing debtor, for a consideration paid to the debtor, and thus fraudulently taken from his creditors. The purpose of the statute was to require notice to the creditors before any transfer could be made outside of the regular course of business. The transaction by Chambers & Company, in turning their stock and business over to C. Shenkberg Company, was not a sale, nor a mortgage, nor an assignment for the benefit of creditors under the statute. It amounted to nothing more than the constituting of C. Shenkberg Company as their trustee for the purpose of making a sale and distributing the proceeds thereof among their creditors. There never was a sale of the stock of Chambers & Company until the public sale made by C. Shenkberg Company to plaintiff. Of this sale all of the creditors of Chambers & Company had received due notice

in writing and had been fully advised of the precise capacity in which C. Shenkberg Company was assuming to sell the property of Chambers & Company. While in some technical respects the bulk sales law was not literally complied with, there was a substantial compliance therewith. Everything was done openly and upon due notice. There was not even a semblance of secrecy or fraud in the actions of either Chambers & Company or C. Shenkberg Company. To put such a construction upon the bulk sales law as is given in the majority opinion, will be to defeat the beneficent purpose of that law. Such a construction will prevent an honest merchant who finds that his business enterprise has not been a success and that failure is inevitable, and who earnestly desires that his creditors shall receive as much as possible on their just claims, from turning his property over to one of them with instructions to take charge of it, and, without the heavy cost and long delay of a court proceeding, sell it and distribute the proceeds among all of his creditors, *pro rata,* imposing only the condition which the bankruptcy court would give him without request, that those who participate in the distribution of the money arising from the sale of his stock shall release him from further liability. The majority opinion will prevent such honorable and inexpensive procedure. This leaves no alternative for the honest failing debtor except to either turn his stock over to the court of bankruptcy, or by a statutory assignment apply it as far as it will go, and go out into the world burdened with debts which will forever stand as a barrier to his resuming business. This was not the intention of the legislature, and is not a proper construction of the bulk sales law.

BARNES, J., concurs in above dissent.